1  Yuo-Fong C. Amato (CA SBN 261453)
   Email: bamato@gordonrees.com
2  GORDON & REES, LLP
   101 W. Broadway, Suite 2000
3  San Diego, California 92101
   Phone: (619) 696-6700
4  Fax: (619) 696-7124

5

6  Attorneys for Plaintiff
   CrossFit, Inc.

7

8                  UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11  CROSSFIT, INC., a Delaware corporation,       )    Case Number:  4:14-CV-00901-JSW
                                                  )
12                          Plaintiff,            )    **NOTICE OF MOTION AND MOTION**
                                                  )    **FOR PRELIMINARY INJUNCTION**
13  v.                                            )
                                                  )    Date:  August 29, 2014
14                                                )    Time:  9:00 a.m.
    360 FITNESS SUPERSTORE, a business entity     )    Location: Oakland Courthouse,
15  of unknown origin; ALEX KRICHEVSKY,           )              Courtroom 5 - 2nd Floor
    individually,                                 )
16                                                )
                                                  )    Hon. Jeffrey S. White
17                                                )
                            Defendants.           )
18                                                )
    _____    )
19                                                )
                                                  )
20  And related counterclaims.                    )
                                                  )
21  _____    )

22          TO THIS HONORABLE COURT, ALL PARTIES AND THEIR COUNSEL OF

23  RECORD:

24          PLEASE TAKE NOTICE that on Friday, August 29, 2014 at 9:00 a.m. in Courtroom 5 of

25  the above-entitled Court located at 1301 Clay Street, Oakland, CA 94612, Plaintiff CrossFit, Inc.

26  ("CrossFit") will move, and does hereby move, this Court for an order enjoining Defendants and

27  all those acting in concert with them from infringing on CrossFit's trademarks.

28

_____
                CROSSFIT'S MOTION FOR PRELIMINARY INJUNCTION

Gordon & Rees LLP
101 W. Broadway
Suite 2000
San Diego, CA  92101

Specifically, CrossFit respectfully requests that this Court issue a preliminary injunction pursuant to Fed. R. Civ. P. Rule 65(a) to restrain and enjoin Defendants 360 FITNESS SUPERSTORE and ALEX KRICHEVSKY ("Defendants") and those in active concert with them, including their agents, representatives, servants, employees, attorneys, independent contractors, partners, officers, directors, members, managers, distributors, partners, subsidiaries, branches, parents, or any other persons or business entities under their control, in connection with Defendants' business selling exercise equipment or any other business relating to fitness, health, and/or exercise:

1. From using the CROSSFIT® trademarks, any variations thereof, or any confusingly similar terms—including without limitation XFit, X Fitness, Cross Fitness—(collectively, the "Infringing Terms").

2. From advertising, displaying, selling, or otherwise distributing (whether physically or in electronic form), any and all advertisements, marketing or promotional materials, product packaging, signage, banners, invoices, pamphlets, leaflets, fliers and/or similar material, as well as any goods containing the Infringing Terms.

3. From using the Infringing Terms online, including without limitation all of Defendants' websites; blogs; social media sites, profiles, and updates; information controlled by Defendants and submitted to third-party sites; and mailing lists.

4. From committing any acts or making any statements calculated, or the reasonably foreseeable consequence of which would be to infringe the CROSSFIT® trademarks (regardless of whether Defendants believe the CROSSFIT® trademarks to be protectable).

5. From committing any acts or making any statements calculated, or the reasonably foreseeable consequence of which would be to confuse, mislead, or deceive consumers as to CrossFit's sponsorship, approval, or affiliation of Defendants.

6. From conspiring with, aiding, assisting, or abetting any other person or business entity in engaging in any of the activities referred to above.

CROSSFIT'S MOTION FOR PRELIMINARY INJUNCTION

1         This motion is based on this notice, the summary of arguments and memorandum of

2    points and authorities below as well as supporting declarations and documents, the Court files

3    and records of this action, matters subject to judicial notice, and on such oral argument and

4    testimony as may be heard by the Court at the time of the hearing of this motion.

5

6    DATED:  July 25, 2014                       Respectfully submitted,

7                                     GORDON & REES LLP

8                    By:   /s/Yuo-Fong C. Amato

9                         Yuo-Fong C. Amato

10                        Attorneys for Plaintiff
                          CrossFit, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROSSFIT'S MOTION FOR PRELIMINARY INJUNCTION

**Gordon & Rees LLP**
101 W. Broadway
Suite 2000
San Diego, CA 92101

1

**SUMMARY OF ARGUMENTS (Chambers Civil Standing Order Rule 7)**

2    CrossFit is the global leader of "small box" fitness programming and the owner of the

3 federally registered CROSSFIT® trademarks.  Despite Defendants' own agreement to cease

4 infringement in December 2012, Defendants again resumed their infringement of the

5 CROSSFIT® trademarks to sell their exercise equipment when they believed CrossFit was no

6 longer monitoring their activities.  For the following reasons, an injunction should issue.

7    CrossFit is likely to succeed on the merits of its trademark infringement claim because it

8 is the owner of the valid, protectable CROSSFIT® trademarks and that Defendants are using a

9 confusingly similar mark.  *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239,

10 1247 (9th Cir. 2013).  In particular, CrossFit shows below that its trademarks are strong;

11 Defendants are using an identical mark; Defendants' exercise equipment is related to CrossFit's

12 fitness training services as well as exercise equipment; Defendants hold themselves out to be a

13 "reliable CrossFit store" to try to actually confuse consumers; the parties operate in similar

14 marketing channels; consumers are unlikely to exercise a high degree of consumer care because

15 the marks and goods are identical; and Defendants intentionally traded on CrossFit's goodwill.

16 *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

17    Absent a preliminary injunction, CrossFit will suffer irreparable harm.  Among other

18 things, Defendants hold themselves out to be a "reliable CrossFit store" but treat consumers

19 poorly, and those consumers will associate that bad experience with CrossFit.  *See Herb Reed*

20 *Enters.*, *supra*, 736 F.3d at 1250.  In addition, by perpetuating falsehoods regarding the

21 CROSSFIT® workouts—specifically, that the workouts are expensive—harms CrossFit

22 irreparably because it constitutes "loss of control over business reputation."  *See id.*

23    The balance of the equities overwhelmingly favors CrossFit, as Defendants will not

24 suffer any prejudice: an injunction would only serve to enforce what Defendants had previously

25 and voluntarily agreed to under the advice of their own independent counsel.

26    Finally, as likelihood of consumer confusion exists here, it would be in the public's

27 interest for Defendants to be enjoined from infringing on the CROSSFIT® trademarks.  *See*

28 *Internet Specialties West, Inc. v. Milon-Digiorgio Enters.*, 559 F.3d 985, 993 (9th Cir. 2009).

# TABLE OF CONTENTS

PAGE

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL BACKGROUND ..............................................................................1

        A.      The CROSSFIT® Trademarks ...............................................................1

        B.      Popularity of the CROSSFIT® Brand Methodology.............................2

                1.      The CROSSFIT® Workouts and the CROSSFIT® Games ........2

                2.      Online Presence ........................................................................3

        C.      Licensing the CROSSFIT® Trademarks ................................................3

        D.      Controlling the Quality of the Services Associated with the CROSSFIT®
                Trademarks ............................................................................................4

        E.      Policing the CROSSFIT® Trademarks ...................................................4

        F.      Defendants' Infringement of the CROSSFIT® Marks ...........................4

        G.      Cease and Desist Communications with Defendants.............................5

        H.      Defendants' Re-infringement of the CROSSFIT® Marks .....................5

        I.      Defendants' Poor Reputation and Customer Confusion........................6

III.    LEGAL STANDARD..........................................................................................7

IV.     ARGUMENT.......................................................................................................7

        A.      CrossFit Is Likely to Succeed on the Merits.........................................7

                1.      CrossFit Owns the Valid, Protectable CROSSFIT® Marks.......7

                2.      The CROSSFIT® Marks Are Strong...........................................8

                3.      Defendants Are Using an Identical Mark ..................................9

                4.      The Parties' Goods and Services Are Related ...........................9

                5.      Defendants Promote Actual Confusion ....................................10

                6.      The Parties Use the Same Marketing Channels........................11

                7.      Consumers Are Unlikely to Exercise a Great Degree of Care...................11

                8.      Defendants Intended on Trading on CrossFit's Goodwill ........12

                9.      Likelihood of Expansion Is Not Applicable Here.....................12

        B.      CrossFit Will Suffer Irreparable Harm Absent an Injunction..............13

        C.      The Balance of Equities Overwhelmingly Favors CrossFit ................14

Gordon & Rees LLP
101 W. Broadway
Suite 2000
San Diego, CA 92101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CROSSFIT'S MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS (continued)**

1

D.    An Injunction Would Serve the Public Interest ....................................................15

2

V.    CONCLUSION...................................................................................................................15

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROSSFIT'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF AUTHORITIES

PAGE

**Cases**

*Alliance For The Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ............................................................... 7, 9

*AMF Inc. v. Sleekcraft Boats,*
   599 F.2d 341 (9th Cir. 1979) ........................................................... 7, 11, 12

*Brookfield Communs. v. W. Coast Entm't Corp.,*
   174 F.3d 1036 (9th Cir. 1999) ........................................................ 8, 9, 12

*Coryn Group II, LLC v. O.C. Seacrets, Inc.,*
   2012 U.S.Dist.LEXIS 49774 (D.Md. Apr. 4, 2012) ................................... 9

*Crossfit, Inc. v. Maximum Human Performance, LLC,*
   2013 U.S.Dist.LEXIS 53676 (S.D.Cal. Apr. 12, 2013) .............................. 8

*CytoSport, Inc. v. Vital Pharms., Inc.,*
   617 F.Supp.2d 1051 (E.D.Cal. 2009) ..................................................... 13

*Downing v. Abercrombie & Fitch,*
   265 F.3d 994 (9th Cir. 2001) ................................................................... 7

*Eclipse Associates Ltd. v. Data General Corp.,*
   894 F.2d 1114 (9th Cir. 1990) ................................................................ 10

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.,*
   618 F.3d 1025 (9th Cir. 2010) .............................................................. 8, 9

*GoTo.com, Inc. v. Walt Disney Co.,*
   202 F.3d 1199 (9th Cir. 2000) .............................................................. 8, 9

*Grocery Outlet, Inc. v. Albertson's, Inc.,*
   497 F.3d 949 (9th Cir. 2007) ................................................................... 7

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt.,*
   736 F.3d 1239 (9th Cir. 2013) ....................................................... 7, 13, 14

*Internet Specialties West, Inc. v. Milon-Digiorgio Enters.,*
   559 F.3d 985 (9th Cir. 2009) ................................................................. 15

*Interstellar Starship Servs. v. Epix, Inc.,*
   304 F.3d 936 (9th Cir. 2002) ................................................................... 8

*Kenner Parker Toys Inc. v. Rose Art Indus., Inc.,*
   963 F.2d 350 (Fed. Cir. 1992) ................................................................. 8

*Lahoti v. Vericheck, Inc.,*
   636 F.3d 501 (9th Cir. 2011) ................................................................... 8

*McGregor-Doniger, Inc. v. Drizzle, Inc.,*
   599 F.2d 1126 (2d Cir. 1979) ................................................................ 11

**Gordon & Rees LLP**
101 W. Broadway
Suite 2000
San Diego, CA 92101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES (continued)**

*Mine O' Mine, Inc.* v. *Calmese*,
    2011 U.S.Dist.LEXIS 75236 (D.Nev. July 11, 2011) ............................................. 8

*Network Automation, Inc. v. Advanced Sys. Concepts*,
    638 F.3d 1137 (9th Cir. 2011) ................................................. 9

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs.*,
    2014 U.S.Dist.LEXIS 67634 (E.D.Wash. May 14, 2014) ......................................... 15

*Quality Candy Shoppes v. Grande Foods*,
    90 U.S.P.Q.2d 1389 (T.T.A.B. 2007) ................................................. 10

*Quantum Fitness Corp. v. Quantum Lifestyle Ctrs. L.L.C.*,
    83 F.Supp.2d 810 (S.D.Tex. 1999) ................................................. 10

*Resorts of Pinehurst, Inc. v. Pinehurst National Corp.*,
    148 F.3d 417,
    47 U.S.P.Q.2d 1465 (4th Cir 1998) ................................................. 10

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*,
    240 F.3d 832 (9th Cir. 2001) ................................................. 13

*Winter v. Natural Resources Defense Council*,
    129 S.Ct. 365 (2008) ................................................. 7, 8

**Statutes**

15 U.S.C. section 1055 ................................................. 10, 12

15 U.S.C. section 1057(b) ................................................. 8

15 U.S.C. section 1065 ................................................. 8

15 U.S.C. section 1072 ................................................. 8

15 U.S.C. section 1115(a) ................................................. 8

**Other Authorities**

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition
    (4th ed. Supp. Jan. 2014) ................................................. 10, 11

Restatement Third, Unfair Competition §23, comment b (1995) ................................................. 10

**Rules**

Federal Rules of Civil Procedure Rule 65 ................................................. 7

Federal Rules of Civil Procedure Rule 65(b)(1)(A) ................................................. 7

I.      INTRODUCTION

CrossFit is the global leader of "small box" fitness programming and the owner of the federally registered CROSSFIT® trademarks.  The CROSSFIT® fitness training program is based on varied, high-intensity movements—such as climbing rope, flipping tires, and jumping rope—performed in small gym environments that foster natural camaraderie, competition, and the fun of sport.  The popularity of the CROSSFIT® fitness program is the result of the quality of CrossFit's product and CrossFit's extensive efforts to market and develop its brand.  Today, more than 10,000 gyms in the United States and around the world are affiliated with CrossFit; the company's website averages 35 million hits per year; and the CROSSFIT® Games, which are televised on ESPN, draw hundreds of thousands of participants and even more viewers.

This case arises out of Defendants' ongoing infringement of the CROSSFIT® trademarks, among other unlawful conduct, to sell Defendants' own exercise equipment and to target CROSSFIT® enthusiasts while doing so.  Despite Defendants' own agreement to cease such infringement in December 2012, Defendants again resumed their infringement when they believed CrossFit was no longer monitoring their activities.  As of today's date, Defendants continue to deceptively hold themselves out as a "reliable CrossFit store" carrying "the very best CrossFit equipment available."  As a result, unsuspecting members of the public are at present being duped into paying Defendants' overpriced exercise equipment to conduct what should be inexpensive CROSSFIT® workouts.

CrossFit therefore respectfully requests that this Court issue the requested injunction, so that Defendants will cease to irreparably harm CrossFit through their infringing uses of the CROSSFIT® trademarks.

II.     FACTUAL BACKGROUND

A.      The CROSSFIT® Trademarks

Developed in the early 1980s, CrossFit is a popular fitness training regimen that helps individuals improve their physical well-being and cardiovascular fitness in an encouraging environment.  CrossFit holds no less than five federal registrations for its CROSSFIT®

Gordon & Rees LLP
101 W. Broadway
Suite 2000
San Diego, CA  92101

1    trademarks, including for example Reg. no. 3,007,458 for "fitness training" ("the '458

2    Registration").  Declaration of Marshall Brenner ("Brenner Decl."), Exh. A.

3           CrossFit also owns common law trademarks, as well as pending trademark applications

4    for its CROSSFIT™ trademarks, including without limitation, Serial no. 85/936,449 for

5    "exercising equipment, namely, weight lifting bars, dumbbells, medicine balls, climbing ropes,

6    nets for sports, exercise bars; fitness machines and equipment, namely, rowing machines;

7    exercise weights; gymnastic apparatus."  *Id.*, Exh. B.

8        **B.**    **Popularity of the CROSSFIT® Brand Methodology**

9            **1.**    **The CROSSFIT® Workouts and the CROSSFIT® Games**

10           The community around the CROSSFIT®-branded workouts is one of the key component

11    of why the workouts are effective:  the camaraderie, as well as the competition, encourages and

12    motivates the trainees.  *Id.*, ¶ 9.  Enthusiastic and positive word-of-mouth from the adherents of

13    the CROSSFIT®-branded workouts has resulted in an exponential growth of the CROSSFIT®

14    brand.  *Id.*  The CROSSFIT® workout is extremely accessible to all who wish to practice it; not

15    only are CROSSFIT® gyms widely available, building a home gym is also extremely affordable.

16    *Id.*  While of course trainees can buy as much equipment as they wish to, trainees can conduct

17    CROSSFIT® exercises at home using only owning weights and a pull-up bar—everything else

18    can be improvised.  *Id.*

19           While the CROSSFIT® methodology has been around since the 1980s, it became

20    extremely popular around the mid-to-late 2000's.  *Id.*, ¶ 10.  CrossFit has hosted the annual

21    CROSSFIT® Games since 2007.  *Id.*  In 2007, the Games attracted 123 competitors.  *Id.*  By

22    2011, a mere four years later, the CROSSFIT® Games welcomed over 26,000 competitors.  *Id.*

23    That number continues to grow:  In 2014, the CROSSFIT® Games welcomed close to 210,000

24    competitors.  *Id.*  Tickets to attend the finals quickly sell out.  *Id.*  Starting in 2011, the

25    CROSSFIT® Games debuted on ESPN2; by 2013, the CROSSFIT® Games aired directly on the

26    main network, ESPN; ESPN also streams the Games live on its universally accessible online

27    broadcast.  *Id.*  A recent replay of the 2011 CROSSFIT® Games enjoyed approximately 800,000

28    viewers.  *Id.*  A Reebok and CrossFit commercial also aired during the 2012 Super Bowl.  *Id.*

1

### 2.      Online Presence

2      The CrossFit website is the primary resource for its trainees, and the website receives at

3 least 35 million hits per year, from 2011 to the present.  *Id.*, ¶ 12.  In the last year, CrossFit

4 received nearly 28 million hits in the U.S., and 41 million hits worldwide.  *Id.*

5      CrossFit's popularity is also reflected on its social media sites.  As of April 2014,

6 CrossFit's Facebook page received close to 1.4 million "likes," and the CROSSFIT® Games

7 Facebook page received approximately 500,000 "likes."  *Id.*  CrossFit has garnered close to

8 450,000 subscribers to its YouTube.com account.  *Id.*  Close to 200,000 users follow CrossFit on

9 Twitter, and close to 180,000 users follow the CROSSFIT® Games on Twitter.  *Id.*  CrossFit

10 also has close to 400,000 followers on Instagram.  *Id.*

11 ### C.      Licensing the CROSSFIT® Trademarks

12      CrossFit encourages individuals that understand and agree with the CROSSFIT®-

13 branded method and philosophy to become CROSSFIT® personal fitness trainers.  *Id.*, ¶ 13.

14 Individuals that have completed CrossFit's nationally standardized accreditation program receive

15 a CROSSFIT® Level 1 trainer certificate, and are authorized to list their CROSSFIT®

16 qualifications, and have a limited license to use the CROSSFIT® brand name.  *Id.*

17      A CrossFit® Level 1 Trainer may open a CROSSFIT® gym—or, as CrossFit refers to

18 them, a CROSSFIT® "box"—if the Level 1 Trainer enters into an annually renewable license

19 agreement with CrossFit and becomes an authorized CROSSFIT® affiliate.  *Id.*, ¶ 14.  Currently,

20 there are over 6,500 CROSSFIT® affiliates in the United States (over 10,000 worldwide) and

21 over 65,000 CROSSFIT® trainers in the United States (over 90,000 worldwide).  *Id.*

22      Other than licensing its CROSSFIT® trademarks to trainers and gyms, CrossFit has also

23 licensed its trademarks on an extremely limited basis to leaders in the field of athletic gear and

24 equipment, including, for example, Reebok in association with apparel and shoes, and Rogue

25 Fitness in association with exercise equipment.  *Id.*, ¶ 15.

26 */ / /*

27

28

**D.      Controlling the Quality of the Services Associated with the CROSSFIT® Trademarks**

The American National Standards Institute ("ANSI") accredits standards across industries, ensuring that the characteristics and performance of products or services are consistent, that people use the same definitions and terms, and that products/services are tested the same way.  *Id.*, ¶ 16.  ANSI has accredited CrossFit to accredit others for CROSSFIT® fitness training.  *Id.*  CrossFit also tours the country every week, using CROSSFIT® affiliate facilities to hold training, certificate, and informational courses.  *Id.*, ¶ 17.  During such visits, CrossFit ensures that the hosting affiliates continue to provide training consistent with the CROSSFIT®-brand principles.  *Id.*  CrossFit also monitors any complaints it may receive and deals with those complaints accordingly.  *Id.*

**E.      Policing the CROSSFIT® Trademarks**

Just as the CROSSFIT® brand of workouts has grown exponentially in popularity, the number of infringers have likewise increased, hoping to appropriate the goodwill CrossFit has amassed for their own benefit.  *Id.*, ¶ 18.  The CROSSFIT® brand is extremely important to CrossFit, and CrossFit devotes a lot of time, energy, and money to defend its intellectual property rights.  *Id.*  CrossFit regularly reminds the readership of its CrossFit Journal of the importance of policing the CROSSFIT® trademarks and encourages everyone inside and outside the CrossFit community to report suspected infringement at http://iptheft.crossfit.com.  *Id.*, ¶ 19.  CrossFit's staff investigates each instance of alleged infringement.  *Id.*  For cases deemed to be infringement, the CrossFit staff will attempt to resolve the issues amicably.  *Id.*  CrossFit retains outside counsel to handle cases that require additional attention.  *Id.*

**F.      Defendants' Infringement of the CROSSFIT® Marks**

Defendant 360 Fitness Superstore operates exercise equipment stores at two physical locations: San Rafael and Walnut Creek.  Amato Decl., Exh. 2.  Defendants have since admitted that they began using the CROSSFIT® trademarks, without authorization, at least as early as January 2011, to sell some of their exercise equipment.  First Amended Answer ¶ 83, Docket no. 22.  However, CrossFit did not become aware of Defendants' infringement until around

September 2012.  Brenner Decl., ¶ 20.  As of September 2012, Defendants advertised that it sold "CrossFit" equipment on at least their website, located at http://www.360fitnesssuperstore.com. Amato Decl., Exh. 3.

### G.    Cease and Desist Communications with Defendants

On September 17, 2012, shortly after CrossFit was made aware of Defendants' infringement of the CROSSFIT® trademarks, CrossFit sent Defendants a cease and desist communication.  Brenner Decl., Exh. H.  Defendants failed to respond, but CrossFit continued its attempt to communicate with Defendants on October 1, 2012; October 18, 2012; and November 6, 2012.  *Id.*, Exh. I; Amato Decl., Exhs. 4-5.

On November 14, 2012, Defendants' then-counsel, Todd Noah from Dergosits & Noah LLP, contacted CrossFit, stating that he had just been retained by Defendants and that he would discuss the matter with Defendants.  *Id.*, ¶ 8.  On November 28, 2012, Mr. Noah communicated that Defendants agreed to remove all references to CrossFit and the CROSSFIT® trademarks from Defendants' website, and that he would notify CrossFit when such changes were complete. *Id.*, Exh. 7.  Although CrossFit had to continually monitor Defendants' progress, Defendants finally finished what they had committed to do on December 13, 2012.  *Id.*, Exh. 9.  CrossFit then considered the matter resolved.  *Id.*, ¶ 12.  Brenner Decl., ¶ 23.

### H.    Defendants' Re-infringement of the CROSSFIT® Marks

Approximately one year later, around February 2014, CrossFit discovered that Defendants had begun to use the CROSSFIT® trademarks yet again.  Brenner Decl., ¶ 24.  This time, instead of using the CROSSFIT® trademarks on Defendants' main website as part of searchable text, Defendants used the CROSSFIT® trademarks in non-searchable images, advertising the sales of various "CrossFit Training Packages."  *Id.*, Exh. I.

Upon further investigation, CrossFit also discovered that beginning on or around February 23, 2013, two months after Defendants agreed to remove all references to "CrossFit" and the CROSSFIT® trademarks, Defendants began referencing both on a separate website, http://www.exerciseequipmentwarehouse.com, to advertise their sales of "CrossFit Equipment," often using the CROSSFIT® trademarks more than 20 times in a single post.  Amato Decl., Exh.

1    10.  On this site, Defendants tried to pass themselves off as a "reliable CrossFit store" carrying

2    "the very best CrossFit equipment available."  *Id.*

3         Having provided Defendants with numerous opportunities to cease their infringement, to

4    no avail, CrossFit then filed the instant action on February 28, 2014.  *See id.* at ¶¶ 14-16.

5    Defendants continue, to this day, to infringe on the CROSSFIT® trademarks.  *Id.*, Exhs. 2, 10.

6         **I.      Defendants' Poor Reputation and Customer Confusion**

7         Defendants' Yelp.com reviews are filled with negative reviews as well as customer

8    misconceptions about CrossFit and the CROSSFIT® methodology.  *Id.*, Exh. 14.  Defendants

9    have accused potential customers of being competitors "soliciting pricing" if they are unwilling

10   to visit the stores in person.  *Id.*  Customers and potential customers find Defendants' equipment

11   "expensive" and "overpriced."  Customers and potential customers find Defendants' behavior to

12   be "rude," "insulting," "inappropriate," "discouraging," and "unacceptable."  *Id.*

13        By being rude and insulting to consumers at the same time they are claiming to be a

14   "reliable CrossFit store," Defendants are damaging the goodwill associated with the

15   CROSSFIT® trademarks—i.e., if Defendants hold themselves out to be a "reliable CrossFit

16   store" but treat consumers poorly, those consumers will associate that bad experience with

17   CrossFit.

18        Defendants have also advertised that they carry "the very best CrossFit equipment

19   available" and that consumers should trust in their "high quality" CrossFit products and of course

20   their expensive prices.  *Id.*, Exh. 10.  This tactic appears to have worked—according to reviews

21   posted on February 24, 2013 and August 2, 2013, Defendants have apparently convinced some

22   customers that CROSSFIT®-branded workouts are indeed "expensive," and to have the proper

23   reliable equipment, CROSSFIT® workout enthusiasts should needlessly spend a lot of money

24   buying such equipment from Defendants.  *Id.*, Exh. 14.  By perpetuating the falsehood that

25   CROSSFIT® workouts are expensive—all so Defendants can convince consumers to buy their

26   expensive equipment—Defendants are derailing CrossFit's business reputation, part of which is

27   that the CROSSFIT®-branded workouts are inexpensive and can be done in one's own home

28   with very limited amount of equipment.

## III.   LEGAL STANDARD

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the court may grant preliminary injunctive relief in order to prevent "immediate and irreparable injury."  Fed. R. Civ. P. 65(b)(1)(A).  A plaintiff seeking preliminary injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 129 S.Ct. 365, 374 (2008); *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1129 (9th Cir. 2011).

## IV.   ARGUMENT

A preliminary injunction should issue because (a) CrossFit is likely to succeed on the merits, (b) CrossFit is likely to suffer irreparable harm absent preliminary relief, (c) the balance of equities overwhelmingly favors CrossFit, and (d) an injunction is in the public interest.

### A.   CrossFit Is Likely to Succeed on the Merits

To establish a likelihood of success on the merits for a trademark infringement claim, a plaintiff must show that it is "(1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark."  *Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1247 (9th Cir. 2013) (citing *Grocery Outlet, Inc. v. Albertson's, Inc.*, 497 F.3d 949, 951 (9th Cir. 2007).  In determining whether a mark is confusingly similar, Ninth Circuit courts look to the following factors:  (1) strength of the mark; (2) similarity of the marks; (3) proximity or relatedness of the goods; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and degree of purchaser care; (7) intent in selecting mark; and (8) likelihood of expansion.  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) (these factors are often referred to as the *Sleekcraft* factors in the Ninth Circuit).  These factors are not necessarily of equal importance nor will all necessarily apply in every case.  *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1008 (9th Cir. 2001).

### 1.   CrossFit Owns the Valid, Protectable CROSSFIT® Marks

CrossFit holds no less than five federal registrations for its CROSSFIT® Marks, including Reg. no. 3,007,458 for "fitness training" ("the '458 Registration").

Under the Lanham Act, these registrations constitute *prima facie* evidence of (a) the validity of the CROSSFIT® Marks, (b) CrossFit's ownership of the CROSSFIT® Marks, and (c) CrossFit's exclusive right to use the CROSSFIT® Marks on or in connection with the goods and services stated in the registrations.  15 U.S.C. §§ 1057(b), 1115(a).  In addition, these registrations constitute constructive notice of CrossFit's claim of ownership of the CROSSFIT® Marks.  15 U.S.C. § 1072.  Further, the '458 Registration has become incontestable.  15 U.S.C. § 1065.  The incontestability is conclusive evidence of the CROSSFIT® Mark's validity and CrossFit's exclusive right to use the Mark in commerce.

### 2.      The CROSSFIT® Marks Are Strong

"The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws."  *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992).  This "strength" of the trademark is evaluated in terms of its conceptual strength and commercial strength."  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*, 618 F.3d 1025, 1032 (9th Cir. 2010); *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 508 (9th Cir. 2011).  The CROSSFIT® Marks are both conceptually and commercially strong.  *See also Crossfit, Inc. v. Maximum Human Performance, LLC*, 2013 U.S.Dist.LEXIS 53676, *8 (S.D.Cal. Apr. 12, 2013) (stating that "CrossFit has a strong trademark").

As to conceptual strength, "[f]rom weakest to strongest, marks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000) (finding the mark "GOTO" for a pay-for-placement search engine to be suggestive), *abrogated on other grounds by Winter*, *supra*, 129 S.Ct. at 374; *Brookfield Communs. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999).

As a "coined term that does not exist in the English language," the term "CrossFit" is most properly characterized as a fanciful mark. *See, e.g., Mine O' Mine, Inc. v. Calmese,* 2011 U.S.Dist.LEXIS 75236 *15-16 (D.Nev. July 11, 2011); *accord Interstellar Starship Servs. v. Epix, Inc.,* 304 F.3d 936, 943 n.6 (9th Cir. 2002) ("fanciful trademarks are nondictionary words").  At a minimum, "CrossFit" is a suggestive mark, as it requires "use [at] imagination

1    or... multistage reasoning to understand the mark's significance." *Fortune Dynamic, supra*, 618

2    F.3d at 1033. "CrossFit" is, in any case, a conceptually strong mark entitled to maximum

3    trademark protection.

4           In addition, the CROSSFIT® trademarks are commercially strong. The evidence

5    submitted in support of the instant motion proves that the CrossFit mark enjoys considerable

6    commercial strength. To cite just a few examples of CrossFit's high profile marketing efforts,

7    the CROSSFIT® Games are broadcast around the world by ESPN, and a CROSSFIT®

8    advertisement aired during the 2012 Super Bowl. Brenner Decl, ¶ 10. These and other high

9    profile advertising efforts increase the strength of CrossFit's mark. *See, e.g., Network*

10   *Automation, Inc. v. Advanced Sys. Concepts,* 638 F.3d 1137, 1149 (9th Cir. 2011); *Coryn Group*

11   *II, LLC v. O.C. Seacrets, Inc.,* 2012 U.S.Dist.LEXIS 49774, * 21 (D.Md. Apr. 4, 2012) (courts

12   "consider[ ] the plaintiffs investment in and extent of advertising, commercial success").

13          The combined conceptual and commercial strength of the CrossFit mark weighs in favor

14   of CrossFit's ability to establish a likelihood of consumer confusion.

15                  **3.      Defendants Are Using an Identical Mark**

16          "[T]he similarity of the marks—has always been considered a critical question in the

17   likelihood-of-confusion analysis." *GoTo.com*, *supra*, 202 F.3d at 1205 (citing *Brookfield*, *supra*,

18   174 F.3d at 1054. "Obviously, the greater the similarity between the two marks at issue, the

19   greater the likelihood of confusion." *Id.* at 1206. Here, Defendants are using an identical mark:

20   "CrossFit." Amato Decl., Exhs. 10, 14. Defendants even capitalizes the "C" and "F," just as

21   CrossFit does. *Id.* Therefore, this factor weighs in CrossFit's favor.

22                  **4.      The Parties' Goods and Services Are Related**

23          "[R]elated goods are generally more likely than unrelated goods to confuse the public as

24   to the producers of the goods." *Brookfield*, *supra*, 174 F.3d at 1055. Courts have, for example,

25   found that nutritional supplements marketed under the "X-Fit" were sufficiently related to

26   CrossFit's fitness training services marketed under the CROSSFIT® trademarks. *Maximum*

27   *Human Performance*, *supra*, 2013 U.S.Dist.LEXIS 53676 at *6 (granting preliminary injunction

28   against defendants' use of the "X-Fit" mark). Courts have also found exercise equipment and

1  health clubs are highly "complementary" where "the danger that the public will believe that the

2  former is associated with the latter is particularly high."  *Quantum Fitness Corp. v. Quantum*

3  *Lifestyle Ctrs. L.L.C.*, 83 F.Supp.2d 810, 825 (S.D.Tex. 1999).

4        Here, Defendants sell exercise equipment.  CrossFit owns common law rights to its

5  CROSSFIT<sup>TM</sup> trademarks in association with exercise equipment, as well as a trademark

6  application that covers exercise equipment.  Brenner Decl., Exh. B, ¶ 15.  CrossFit specifically

7  licenses its trademarks to Rogue Fitness in association with exercise equipment, and the goodwill

8  associated with the licensee's use of a trademark owners' trademark inures to the benefit of the

9  trademark owner—i.e., to CrossFit.  *See* 15 U.S.C. § 1055; *Quality Candy Shoppes v. Grande*

10  *Foods*, 90 U.S.P.Q.2d 1389, 1392 (T.T.A.B. 2007) ("use of a mark by a…licensee…constitutes

11  'use' of that mark attributable to the trademark owner"); J. Thomas McCarthy, MCCARTHY ON

12  TRADEMARKS AND UNFAIR COMPETITION § 18:52 (4th ed. Supp. Jan. 2014).

13        Even if one were to only consider CrossFit's rights in its CROSSFIT® trademarks as it

14  pertains to fitness training, Defendants' sales of exercise equipment—specifically for use in the

15  CROSSFIT® brand of training—are undoubtedly complementary to CrossFit's services.

16        For the above reasons, this factor weighs in favor of CrossFit, as the parties' goods and

17  services are related and/or complementary.

18       **5.    Defendants Promote Actual Confusion**

19        A plaintiff is not required to show actual confusion to prove likelihood of confusion.

20  *Eclipse Associates Ltd. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990).  The

21  existence of actual confusion, however, is potent and in itself can constitute conclusive evidence

22  of likely confusion and infringement.  *Resorts of Pinehurst, Inc. v. Pinehurst National Corp.*, 148

23  F.3d 417, 47 U.S.P.Q.2d 1465 (4th Cir 1998); *see also* Restatement Third, Unfair Competition

24  §23, comment b (1995).

25        Here, through multiple posts that use the CROSSFIT® marks numerous times,

26  Defendants have tried to pass themselves off as a "reliable CrossFit store" carrying "the very

27  best CrossFit equipment available."  Amato Decl., Exh. 10.  And as discussed above, this tactic

28  appears to have worked—according to Yelp.com reviews posted on February 24, 2013 and

1  August 2, 2013, Defendants have apparently convinced some customers that CrossFit "is

2  expensive" so that those customers bought expensive equipment from Defendants, thinking they

3  were buying "top quality CrossFit gear."  *Id.*, Exhs. 10, 14.  As Defendants intentionally

4  encourage consumer confusion, this factor weighs in CrossFit's favor.

5  **6.     The Parties Use the Same Marketing Channels**

6  "Convergent marketing channels increase the likelihood of confusion."  *Sleekcraft*, *supra*,

7  599 F.2d at 353.  Here, both Defendants and CrossFit market their respective goods and services

8  using the Internet, as well as word-of-mouth among fitness enthusiasts.  *See* Brenner Decl., ¶ 9-

9  12; Amato Decl., Exhs. 10, 14.  These channels, being convergent, weigh in CrossFit's favor.

10  **7.     Consumers Are Unlikely to Exercise a Great Degree of Care**

11  When there is a strong likelihood of confusion created by other factors, even a high level

12  of care exercised by an ordinary purchaser in a certain setting will not be sufficient to tip the

13  scales in the other direction.  J. Thomas McCarthy, McCarthy on Trademarks and Unfair

14  Competition § 23:95 (4th ed. Supp. Jan. 2014).  For example, "[i]n some cases, of course, as

15  where the products are identical and the marks are identical, the sophistication of buyers cannot

16  be relied upon to prevent confusion."  *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126,

17  1137 (2d Cir. 1979).

18  Here, the type of exercise equipment required for CROSSFIT®-branded workouts—

19  weights, kettlebells, jump ropes, medicine balls, etc.—is not so expensive such that consumers

20  can be thought to exercise a great degree of care, especially compared to treadmills and elliptical

21  machines.  Indeed, CrossFit has advocated that its CROSSFIT®-branded workouts are

22  inexpensive and accessible to all.  Brenner Decl. ¶ 9.

23  Further, through licensing, CrossFit has rights to its trademarks as it pertains to exercise

24  equipment, which is exactly what Defendants sell.  Where the products and marks are identical,

25  so that "the sophistication of buyers cannot be relied upon to prevent confusion."  *McGregor-*

26  *Doniger*, *supra*, 599 F.2d at 1137.  This is especially true where Defendants actively attempt to

27  confuse consumers with their own rhetoric, calling themselves "a trustworthy CrossFit

28  equipment store," promising that they sell "high quality," "exceptional," "good" and "most

1  effective CrossFit gear."  Amato Decl, Exh. 10.  For the above reasons, this factor weighs in

2  favor of CrossFit.

3  **8.      Defendants Intended on Trading on CrossFit's Goodwill**

4  "When the alleged infringer knowingly adopts a mark similar to another's, reviewing

5  courts presume that the defendant can accomplish his purpose: that is, that the public will be

6  deceived." *Sleekcraft*, *supra*, 599 F.2d at 354.

7  Based on their website posts and description, Defendants were well-aware of CrossFit,

8  and were at least constructively aware of the CROSSFIT® trademarks and trademark

9  applications.  Amato Decl., Exhs. 3, 10.  Further, CrossFit specifically informed Defendants of

10  its intellectual property rights on September 17, 2012 and continued to do so on a repeated basis.

11  Brenner Decl., Exh. H.  In response, Defendants specifically agreed to cease their infringement

12  of the CROSSFIT® trademarks, only to resume infringement once they believed CrossFit was no

13  longer monitoring their activities.  Amato Decl, Exhs. 2, 7, 10.  This in and of itself is proof that

14  Defendants intended to trade on the goodwill of the CROSSFIT® trademarks.

15  In addition, as previously mentioned, Defendants have tried to pass themselves off as a

16  "reliable CrossFit store" carrying "the very best CrossFit equipment available."  *Id.*, Exh. 10.

17  This serves as conclusive evidence that Defendants intended to trade on the goodwill of the

18  CROSSFIT® trademarks.

19  **9.      Likelihood of Expansion Is Not Applicable Here**

20  "When goods are closely related, any expansion is likely to result in direct competition."

21  *Sleekcraft*, *supra*, 599 F.2d at 354 (citations omitted).  Where the parties already sell the same

22  products and/or services, however, this factor is irrelevant.  *Brookfield*, *supra*, 174 F.3d at 1060.

23  Here, Defendants sell exercise equipment.  As mentioned previously, CrossFit

24  specifically licenses its trademarks to Rogue Fitness in association with exercise equipment, and

25  the goodwill associated with the licensee's use of a trademark owners' trademark inures to the

26  benefit of the trademark owner—i.e., to CrossFit.  *See* 15 U.S.C. § 1055.  Further, CrossFit owns

27  a trademark application that covers exercise equipment.  Brenner Decl., Exh. B.

28  Since the parties already sell the same products and/or services, this factor is irrelevant.

**B. CrossFit Will Suffer Irreparable Harm Absent an Injunction**

A plaintiff must establish likelihood of irreparable harm to obtain a preliminary injunction in a trademark infringement case. *Herb Reed Enters.*, *supra*, 736 F.3d at 1249. Loss of control over business reputation and damage to goodwill constitutes irreparable harm. *Herb Reed Enters.*, *supra*, 736 F.3d at 1250 (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001)). "Trademarks serve as the identity of their owners and in them resides the reputation and goodwill of their owners. Thus, if another person infringes the marks, that person borrows the owner's reputation, whose quality no longer lies within the owner's control." *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F.Supp.2d 1051, 1080 (E.D.Cal. 2009).

Here, Defendants have and will continue to irreparably harm CrossFit. As previously mentioned, Defendants have tried to pass themselves off as a "reliable CrossFit store" carrying "the very best CrossFit equipment available." Amato Decl., Exh. 10. Documentary evidence reflecting consumer feedback on social media establishes that Defendants, who falsely claim association with CrossFit, are unquestionably damaging the goodwill of the CROSSFIT® trademarks. Frustrated customers have opined that Defendants are very "expensive" and "rude" and like to "'bully' wealthy Marinites into buying." Amato Decl., Exh. 14. Other consumers have been convinced that exercise equipment used in CROSSFIT® workouts should be as expensive as what Defendants are charging:

> Yes it is expensive. Yes crossfit is expensive.

*Id.* Another defender has bought into Defendants' misinformation regarding prices:

> You are going to pay more at this kind of store, deal with it and understand the reasoning why…That probably doesn't mean much to you flavor of the month-Crossfitters…

*Id.* Below are the ways in which Defendants have and will continue to irreparably harm CrossFit, unless enjoined:

First, by being rude and insulting to consumers at the same time they are claiming to be a "reliable CrossFit store," Defendants are damaging the goodwill associated with the

1   CROSSFIT® trademarks—i.e., if Defendants hold themselves out to be a "reliable CrossFit

2   store" but treat consumers poorly, those consumers will associate that bad experience with

3   CrossFit.  *See Herb Reed Enters.*, *supra*, 736 F.3d at 1250.

4          Second, by perpetuating the falsehood that CROSSFIT® workouts are expensive—all so

5   Defendants can convince consumers to buy their expensive equipment—harms CrossFit

6   irreparably because it constitutes "loss of control over business reputation."  Specifically,

7   Defendants are derailing CrossFit's business reputation, part of which is that the CROSSFIT®-

8   branded workouts are inexpensive and can be done in one's own home with very limited amount

9   of equipment.  *See id.*

10         Third, also by perpetuating the falsehood that CROSSFIT® workouts are expensive,

11  Defendants have convinced some of its own consumers to repeat that falsehood, further

12  exemplifying harm to CrossFit, as CrossFit further loses control over its business reputation as

13  an inexpensive workout option.  *See id.*

14         Finally, again by perpetuating the falsehood that CROSSFIT® workouts are expensive

15  and convincing some of its consumers to perpetuate that same falsehood, other potential

16  CROSSFIT® consumers may be deterred from joining the CrossFit community.  Even if

17  CrossFit's numbers have been growing, it could be growing a lot faster but for Defendants'

18  interference.  This loss would be extremely hard to quantify in monetary terms, because it would

19  be extremely difficult to locate such consumers.  *See id.*

20         For the reasons above, CrossFit has shown that there is a likelihood of irreparable harm

21  as required by *Herb Reed Enters.*, *supra*, 736 F.3d at 1249.

22         **C.     The Balance of Equities Overwhelmingly Favors CrossFit**

23         As demonstrated above, CrossFit is likely to succeed in its trademark infringement claim,

24  and would suffer irreparable harm if Defendants are not enjoined.

25         Defendants, on the other hand, will not suffer any prejudice.  Defendants had previously

26  agreed to stop using the CROSSFIT® trademarks; a preliminary injunction would only serve to

27  enforce what Defendants had previously and voluntarily agreed to under the advice of their own

28  independent counsel.  Amato Decl., Exh. 7.  Defendants demonstrated that it did <u>not</u> need to use

---

14

1  the CROSSFIT® trademarks to sell its products, using instead the terms "Cross Training,"

2  "WOD," as well as the actual generic terms of the products themselves, such as "medicine balls,"

3  "bumper plates," "olympic bars," "kettlebells," etc. *Id.*, Exh. J.

4      Defendants are not entitled to boost their sales and appropriate CrossFit's goodwill by

5  infringing, and then re-infringing on the CROSSFIT® trademarks. Defendants are not entitled to

6  reap the benefits conferred to CrossFit's licensees, such as Rogue Fitness, for sales of exercise

7  equipment. Defendants are not entitled to portray themselves as a "reliable CrossFit store"

8  carrying "the very best CrossFit equipment available," then destroying CrossFit's reputation and

9  CROSSFIT® principles by mistreating consumers and misleading them to believe that a

10 CROSSFIT® workout requires the expensive equipment Defendants sell.

11     **D.**    **An Injunction Would Serve the Public Interest**

12     The public interest favors a preliminary injunction where there is a likelihood of

13 confusion. *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs.*, 2014 U.S.Dist.LEXIS 67634, *14

14 (E.D.Wash. May 14, 2014). Avoiding confusion to the consumers is in the public interest. *Id.*

15 (citing *Internet Specialties West, Inc. v. Milon-Digiorgio Enters.*, 559 F.3d 985, 993 (9th Cir.

16 2009)). As demonstrated above, since a likelihood of consumer confusion exists here, it would

17 be in the public's interest for Defendants to be enjoined from infringing on the CROSSFIT®

18 trademarks.

19 **V.**    **CONCLUSION**

20     For the reasons enumerated above, CrossFit respectfully requests that this Court enter a

21 preliminary injunction against Defendants relating to their use of the CROSSFIT® trademarks.

22 DATED: July 25, 2014          Respectfully submitted,

23           GORDON & REES LLP

24        By:  /s/Yuo-Fong C. Amato

25             Yuo-Fong C. Amato
            Attorneys for Plaintiff

26             CrossFit, Inc.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon & Rees LLP**
101 W. Broadway
Suite 2000
San Diego, CA 92101

1083897/20250628v.1

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2014, a copy of the foregoing document was filed via the Court's electronic filing system.  Notice has been automatically served to:

CHRISTOPHER WIMMER (SBN 263275)
EMERGENT LEGAL
25 Taylor Street
San Francisco, California 94102
p: 415/894-9284
f: 415/276-8929
e: cwimmer@emergentlegal.com

RANDOLPH GAW (SBN 223718)
GAW | POE LLP
100 Pine Street, Suite 1250
San Francisco, California 94111
p: 415/745-3308
f: 415/737-0642
e: rgaw@gawpoe.com

Attorneys for Defendants
and Counterclaimants
360 FITNESS SUPERSTORE
and ALEX KRICHEVSKY

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and executed on July 25, 2014, in the City of Allentown, Commonwealth of Pennsylvania.

*/s/ Yuo-Fong C. Amato*
Yuo-Fong C. Amato